UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| KATHY D. HANE, | ) | Civil Action No.: 4:12-cv-1530-MGL-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| BB&T CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**I.     INTRODUCTION**

In this employment discrimination case, Plaintiff alleges that Defendant[1] discriminated against her and created a hostile work environment because of her age in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq. Presently before the Court is Defendant's Motion for Summary Judgment (Document # 28). All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), DSC.  Because this is a dispositive motion, this Report and Recommendation is entered for review by the district judge.

**II.    FACTS**

Plaintiff, who was born in 1955, was hired by Coastal Federal Bank (Coastal Federal) on March 8, 2004. Pl. Dep. 26. Plaintiff began her career with Coastal Federal as the manager of the Murrells Inlet and Pawleys Island branches. Pl. Dep. 26. In approximately 2006, Plaintiff became a Senior Branch Manager/Assistant Vice President, responsible for five branches at Coastal Federal. Pl. Dep. 26-27.

---

[1] Plaintiff names as the Defendant in this action BB&T Corporation. Defendant represents that the proper entity is Branch Banking and Trust Company (BB&T).

-2-

On March 26, 2007, BB&T offered Plaintiff employment as a Financial Center Leader (FCL) IV over the Murrells Inlet Square branch as part of BB&T's acquisition of Coastal Federal. Pl. Dep. 35-37; Pl. Dep. Ex. 2. With the acquisition of Coastal Federal, BB&T had two branches within one mile of one another in Murrells Inlet. Pl. Dep. 36. Plaintiff accepted this offer of employment and began her position with BB&T in August 2007. Pl. Dep. 37. As an FCL IV, Plaintiff was one step from the highest FCL level, and as compared to the lower FCL levels, Plaintiff had corresponding higher production goals and pay. Pl. Dep. 55; Robinson Dep. 85. The levels of FCL depend on deposit size, retail loan portfolios, earnings, client households assigned to and market place potential of the branch. Pl. Dep. 39; FCL IV Job Description (Ex. 5 to Pl. Response).

As compared to Plaintiff's former employer, Coastal Federal, BB&T was "more structured" and there was more of an expectation to "cross sell" products such as "payroll . . . , the merchants services, the investment trust, wealth management, mortgage, commercial . . . insurance." Pl. Dep. 56-57. When she first began working for BB&T, Plaintiff was paired with a "buddy" for two weeks to help her "navigate those initial changes" occurring as a result of the conversion from Coastal Federal to BB&T. Pl. Dep. 58-59. She also took classes within BB&T University to become more familiar with policies and procedures, BB&T Learning (Ex. 6 to Pl. Response), and was also given the opportunity to go online to BB&T's intranet to obtain ideas on how to reach various goals she may have. Pl. Dep. 67. Additionally, Plaintiff had several weekly meetings or conference calls with her employees, peers, and managers to discuss issues such as sales, product knowledge, or the "perfect client experience." Pl. Dep. 59-64. During these meetings, the various FCLs would share experiences and ask questions. Pl. Dep. 59-64. For sales meetings, the FCLs were required to have forms filled out to discuss specific action items on which to focus and they could hear what other FCLs were doing to achieve their goals. Pl. Dep. 66-67. Plaintiff also requested and received

additional training on lending issues, but Plaintiff asserts the training was not helpful because the individual sent to train her stayed busy with other things. Pl. Dep. 64, 69.

Initially, Plaintiff was responsible for seven tellers (one of whom was a teller supervisor), two Relationship Bankers, and a receptionist. Pl. Dep. 71-72. Later, the number of tellers was reduced from seven to four. Pl. Dep. 72-73. Towards the end of Plaintiff's employment with BB&T, the receptionist position was eliminated. Pl. Dep. 73.

Plaintiff's first manager at BB&T was Robbie Douglas, Sales and Service Leader (SSL) who, in turn, reported to Frank Smith, III, the Retail Banking Manager. Pl. Dep. 51-52. Subsequently, in March or April 2009, Plaintiff began reporting to LuAnn Robinson, another SSL who also reported to Smith. Pl. Dep. 52; Robinson Dep. 20.

Douglas prepared Plaintiff's initial performance appraisal, referred to as a Personal Development Plan (PDP), which covered the first four months of her employment with BB&T in 2007. (Pl. Dep. 75:3-23; Pl. Dep. Ex. 8). Because the branch had just converted from Coastal Federal to BB&T, Douglas had not much time to evaluate Plaintiff; nevertheless, Douglas rated Plaintiff as a Performer ("P"), the middle rating available for the PDP.[2] Pl. 75-79; Pl. Dep. Ex. 8. As a result of this PDP, Plaintiff received a salary increase of two percent. Pl. Dep. 80-81.

For Plaintiff's 2008 PDP, also prepared by Douglas, Plaintiff's overall rating was "Growth Opportunity," one ranking below Performer. Pl. Dep. 81-82; Pl. Dep. Ex. 9. Specifically, Plaintiff was rated as Growth Opportunity for: (1) work quality; (2) client service delivery; (3) negotiating/closing; (4) sales behaviors; (5) sales goals; (6) coaching; (7) corporate perspective; (8) quality client service leadership; and (9) sales leadership. Pl. Dep. 82-83; Pl. Dep. Ex. 9. As for

---

[2]The ratings available under BB&T's PDP plan are Exceptional Performer, Very Good Performer, Performer, Growth Opportunity, and Needs Immediate Improvement. Pl. Dep. 82-83.

Plaintiff's 2008 objectives, Douglas rated her as Growth Opportunity for all objectives except for one, employee turnover, for which he rated Plaintiff as a Performer. Pl. Dep. 83-84; Pl. Dep. Ex. 9. Plaintiff did not receive a salary increase as a result of this review.[3]  Pl. Dep. 86.

After Robinson replaced Douglas as Plaintiff's SSL, Robinson gave Plaintiff her PDP for 2009. Pl. Dep. 87-88; Pl. Dep. Ex. 11.  Robinson rated Plaintiff as Performer.  Pl. Dep. 95, 99; Pl. Dep. Ex. 11.  However, for the mid-year comments to the 2009 PDP, Robinson pointed out that Plaintiff's branch was not meeting the goals assigned to a branch that has two Relationship Bankers. Pl. Dep. 89; Pl. Dep. Ex. 11.  She further commented that Plaintiff: (1) continued to refund too many fees; (2) coaching employees was a weakness for Plaintiff; (3) Plaintiff's mortgage income was behind plan (and hers was the only branch in Horry County behind plan); (4) non-interest income at Plaintiff's branch was behind plan; (5) Plaintiff's loan production and closing ratio needed to improve; (6) that Plaintiff only had 8.87 points in the "matrix;"[4] and (7) Plaintiff had closed zero small business loans. Pl. Dep. 91-95; Pl. Dep. Ex. 11.  Plaintiff finished 2009 with 13.4 in the matrix, which was below the expected 75 points. Pl. Dep. 97; Robinson Decl. at ¶ 6. In addition, Plaintiff's branch decathlon[5] ranking was at least in the bottom quarter of all branches in her region with an overall balance performance of 62.7 percent. Pl. Dep. 97-98.  Robinson asserts

---

[3] To be eligible for a salary increase, Plaintiff had to receive at least a Performer rating

[4] According to Plaintiff, for the matrix score, employees get "different points for reaching different tiers in different categories in order to obtain a bonus . . ." with some goals dependent upon how a region or city was performing, while others were for her specific branch.  Pl. Dep. 85. These points could total up to a maximum of 100 points. Pl. Dep. 85. The matrix was just one tool that BB&T used to measure performance.  Robinson Decl. at ¶ 6.

[5] The decathlon is another tool used by BB&T; it measures a branch's performance in promoting solutions and products for sales positions within the bank.  Smith Dep. 12; Robinson Dep. 23; Robinson Decl. at ¶ 6. The decathlon goal was 100%.  Pl. Dep. 98-99. BB&T considers the decathlon, the matrix, and all other indices of performance to be important in judging performance. Pl. Dep. 105-106.

that she gave Plaintiff an overall rating of Performer because Robinson had only recently become Plaintiff's SSL and, therefore, gave Plaintiff the "benefit of the doubt" in the belief that Plaintiff could improve. Robinson Decl. at ¶ 7. Robinson acknowledged in her mid-year comments that "[t]he economic environment that the bank and our country is experiencing has indeed brought conditions and challenges that we have never had. Banking as [Plaintiff] has always known it has changed forever and it is our responsibility as Store Owners to both adapt and overcome." Pl. Dep. Ex. 11. As a result of the 2009 PDP and overall branch performance, Plaintiff did not receive a salary increase or bonus. Pl. Dep. 100-102; Robinson Decl. at ¶ 7. To be eligible for a bonus, FCLs had to achieve a matrix score of at least 75 and be rated as a Performer on the PDP. Pl. Dep. 112:2-9.

For 2010, Plaintiff received a total matrix score of 87.31. Pl. Dep. 106-112; Pl. Dep. Ex. 13. However, on Plaintiff's 2010 PDP, Robinson rated Plaintiff overall as Needs Immediate Improvement for deficiencies in a number of performance measures, including her loan production, net new transaction accounts, and decathlon performance. Pl. Dep. 106-112, 123-124. Specifically, Robinson noted that Plaintiff had weaknesses in areas such as "[e]xecuting on BB&T's processes, behaviors, and beliefs," "[t]eam building/[t]eam development," "[e]xecution of Small Business calling," "[d]eveloping outside business," "[c]oaching to achieve maximum results," "[o]verall branch performance," "[c]onsistent loan production," and "[t]urnover – 41.95% with goal of 20%." Pl. Dep. Ex. 16. As a result of the Needs Immediate Improvement rating, Plaintiff was ineligible for a salary increase or bonus. Pl. Dep. 123-124; Pl. Dep. Ex. 16; Robinson Decl. at ¶ 11.

On January 25, 2011, Robinson put Plaintiff on a Performance Improvement Plan (PIP). Pl. Dep. 116-118; Pl. Dep. Ex. 15, 17. On the PIP, Robinson outlined areas of concern with respect to Plaintiff's performance, including loans, production, teller issues, investment referrals, and her

substandard performance on the decathlon measurements. Pl. Dep. 120; Pl. Dep. Ex. 15. Robinson provided Plaintiff with examples of specific things that Plaintiff could do to improve her performance and lowered some of Plaintiff's standard production goals. Pl. Dep. 120-121, 144-145; Pl. Dep. Ex. 15, 25. Plaintiff understood that she was subject to further disciplinary action if her performance did not improve under the PIP and if she did not sustain an acceptable level of performance. Pl. Dep. 122.

On April 5, 2011, Robinson gave Plaintiff a written warning for Plaintiff's inability to deal with teller performance problems, low sales calls, and Plaintiff's failure to proactively schedule joint calls with Robinson. Pl. Dep. 124-126; Pl. Dep. Ex. 17. For example, Plaintiff failed to give two employees written warnings, failed to call on three to five businesses each week during the first quarter of 2011, and had not scheduled any joint calls with Robinson. Pl. Dep. Ex. 17. Plaintiff understood that if she did not meet the expectations outlined in the written warning that she would be subject to further discipline, up to and including termination. Pl. Dep. 126-127. Plaintiff admits that her branch was still not meeting the majority of the goals that BB&T had set for it. Pl. Dep. 127.

To assist Plaintiff in improving her performance, Smith had weekly calls with the FCLs to discuss methods for meeting certain decathlon goals. Pl. Dep. 127-129; Pl. Dep. Ex. 18. In addition, Robinson provided the FCLs that reported to her who had less than 80% in the decathlon with forms to assist in meeting those goals, specifically by requiring the FCLs to allot time to areas that would improve their decathlon score. Pl. Dep. 129-130; Pl. Dep. Ex. 19. At one time, Plaintiff was informed that Robinson would come to Plaintiff's branch once a week to assist her. Pl. Affidavit (Ex. 1 to Pl. Response); Pl. Statement (Ex. 4 to Pl. Response). However, Robinson did not come to Plaintiff's branch to provide one on one training or otherwise follow through with the

agreed-upon coaching. Pl. Dep. 71.

On June 1, 2011, the branch at Murrell's Inlet Square Mall was robbed. Pl. Aff.; Pl. Statement. The tellers and Plaintiff were held at gun point. The men who robbed the bank wore masks and fired their guns. Id. After the robbery, Robinson asked Plaintiff if she had thought about retiring. Pl. Response ¶ 36; Pl. Dep. 150-51.

On June 7, 2011, Robinson sent an email to all branches, including Plaintiff's, whose decathlon scores were 65% or below as of that date. Decathlon Performance Call Email (Ex. 12 to Pl. Response). The other individuals who were at 65% or less were Justin Gooding, Kristen Rabon, Andrea Higgins, Faith Mormon, Denise Brown, Sherri Cato, and Brandy Cagle. Id. The email provided for a conference call and the topics the individuals should be prepared to discuss. Id. It also indicated that every branch needed to have a decathlon score of 80% or better by June 30, 2011. Id.

As of June 30, 2011, Plaintiff's decathlon score was 51.7 % and Robinson gave Plaintiff a final written warning. Pl. Dep. 133-134; Pl. Dep. Ex. 20. Robinson noted that her "specific and ongoing concerns have been [Plaintiff's] ability to grow [her] branch in loans, income, decathlon results, and to provide the leadership needed to make both the branch and the team successful." Pl. Dep. Ex. 20. Robinson pointed out that Plaintiff's branch overall decathlon score was 51.7% against a goal of 80% at that time. Id. Finally, Robinson discussed Plaintiff's poor loan production, including that she was significantly below goal with respect to loans closed and loan application entered. Id. Plaintiff understood that if the expectations were not met, her employment with BB&T would be terminated. Pl. Dep. 134; Pl. Dep. Ex. 20.

Plaintiff's performance did not improve following the written warning on June 30, 2011. The matrix for Plaintiff's branch as of July 31, 2011 was 54.57%, lower than her matrix

performance in 2010. Pl. Dep. 134-137; Pl. Dep. Ex. 21. Plaintiff again had low performance with respect to loan production, customer service, past-due loans, and net income growth, scoring no points on the matrix with respect to these goals. Pl. Dep. 134-137; Pl. Dep. Ex. 21. Additionally, Plaintiff did not meet the minimum amount for retail loans during the twelve-month period beginning August 2010 even after Robinson set a lower goal for loan production in Plaintiff's PIP. Pl. Dep. 144-145. Plaintiff admits that she did not meet loan production goals for 2008, 2009, or 2010. Pl. Dep. 145-148.

In July 2011, BB&T decided to close the Murrells Inlet Square branch where Plaintiff worked and consolidate operations with the other BB&T branch in Murrells Inlet. Robinson Decl. ¶ 8. Robinson made the final decision to terminate Plaintiff's employment after consultation with Smith and Mike Watson, BB&T's Regional Associate Relations Manager. Robinson Decl. ¶ 8; Smith Dep. 24. Toward the end of July 2011, Robinson and Smith informed Plaintiff that her branch would be closing, and asked Plaintiff if she had thought about retiring. Pl. Statement. When Plaintiff responded that she was too young to retire, they informed her she could choose to resign or she would be terminated. Pl. Dep. 148-149. Plaintiff did not resign, and BB&T terminated Plaintiff's employment in early August 2011. Pl. Dep. 13, 153-154. Because Plaintiff's branch was closed, she was not replaced by another employee. Pl. Dep. 181.

### III.  STANDARD OF REVIEW

The moving party bears the burden of showing that summary judgment is proper. Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. <u>Celotex</u>, 477 U.S.

317. Once the moving party has brought into question whether there is a genuine dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial. Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings. See Celotex, 477 U.S. at 324. Rather, the party must present evidence supporting his or her position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A); see also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

### IV.    DISCUSSION

#### A.    Discrimination in Violation of the ADEA

Plaintiff alleges that Defendant terminated her employment because of her age in violation

of the ADEA. The ADEA makes it unlawful for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age. 29 U.S.C. § 623(a)(1).

Plaintiff briefly asserts that she has presented direct evidence of age discrimination in that her supervisor asked her on two different occasions if she was going to retire. To demonstrate direct evidence of discrimination at the summary judgment stage, a plaintiff must "'produce direct evidence of a stated purpose to discriminate [on the basis of age] and/or circumstantial evidence of a stated purpose to discriminate [on the basis of age] of sufficient probative force to reflect a genuine issue of material fact.'" E.E.O.C. v. Clay Printing Co., 955 F.2d 936, 941 (4th Cir.1992) (quoting Goldberg v. B.Green and Co., 836 F.2d 845, 848 (4th Cir.1988)). There must be a nexus between the alleged discriminatory statement, taken in its proper context, and an employment decision made by the employer. Id. at 942. However, while repeated references to retirement despite evidence of adequate performance may constitute direct evidence of discrimination, one or two inquiries about retirement alone are insufficient to rise to the level of direct evidence. See Kaniff v. Allstate Ins. Co., 121 F.3d 258, 263 (7th Cir. 1997); Scott v. Potter, 182 F. App'x 521, 526 (6th Cir.2006) (citing Hazen Paper Co. v. Biggins, 507 U.S. 604, 611, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993)); Martin v. Bayland Inc., 181 F. App'x 422, 423–24 (5th Cir.2006). The evidence here is insufficient to constitute direct evidence of discrimination based on age.

In the absence of direct evidence of discrimination, courts apply the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36

L.Ed.2d 668 (1973), in which the plaintiff must establish a prima facie case of discrimination.[6] To sufficiently allege a prima facie case of discrimination under the ADEA, a plaintiff must allege (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) that similarly-situated employees outside the protected class received more favorable treatment. Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir.2004).

If Plaintiff establishes a prima facie case, the burden shifts to Defendant to produce a legitimate, nondiscriminatory reason for the adverse action. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981). This is merely a burden of production, not of persuasion. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993).

Once Defendant has met its burden of production by producing its legitimate, nondiscriminatory reason, the sole remaining issue is "discrimination vel non." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000)(citing Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983)). In other words, the burden shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by Defendant is not its true reasons, but was pretext for discrimination. Reeves, 530 U.S. at 143. Throughout the burden shifting scheme set forth in McDonnell Douglas, the ultimate burden of proving that Defendant intentionally discriminated against Plaintiff remains at all times with Plaintiff. Plaintiff has the ultimate burden of presenting evidence from which a reasonable jury

---

[6]The Supreme Court has noted that it "has not definitively decided" whether the McDonnell Douglas framework, first developed in the context of Title VII cases, "is appropriate in the ADEA context." Gross v. FBL Financial Services, Inc., 557 U.S. 167, 129 S.Ct. 2343, 2349 n.2, 174 L.Ed.2d 119 (2009). In the absence of further direction from the Supreme Court, the undersigned must follow Fourth Circuit precedent, which applies the McDonnell Douglas framework to ADEA claims. See Hill, 354 F.3d at 285; see also Bodkin v. Town of Strasburg, 2010 WL 2640461 at *4-5 (4th Cir. June 29, 2010) (continuing to apply the McDonnell Douglas framework in an ADEA case following the Gross opinion).

could conclude defendant intentionally discriminated against him.

Defendant argues that Plaintiff cannot establish a prima facie case of discrimination because she cannot show that her job performance was satisfactory or that similarly-situated employees outside the protected class received more favorable treatment.

To show satisfactory job performance, Plaintiff asserts in her response that she received a rating of Performer on her 2010 PDP and that in May of 2010, she received 100% during a "Mystery Shop" conducted on her branch, and that her branch exceeded goal for the BB&T @ Work program in 2010. However, the PDP to which she is referring is the 2009 PDP. In 2010 she received a Needs Immediate Improvement rating. Pl. Dep. Ex. 16. In addition, the Mystery Shop occurs on one day and measures only how well Plaintiff's employees performed with customers. Pl. Response 21. Similarly, the BB&T @ Work program is also only one type of sales initiative. Neither the Mystery Shop nor the BB&T at Work program involve the areas in which Plaintiff consistently had issues, namely loan production, investment referrals and decathlon results. Robinson Decl. 2 ¶¶ 5-8 (Ex. 1 to Def. Reply).

Plaintiff does not address the fact that she received more than one evaluation that was less than satisfactory during her time with Defendant. In her evaluation, or PDP, for her first full year in 2008, Plaintiff received a rating of "Growth Opportunity," the next to the last rating in the five-level rating scale. Plaintiff did not disagree with any areas of this review. Pl. Dep. 86. In 2009, her rating improved to Performer, the mid-level rating, even though her supervisor, Robinson, noted that Plaintiff's branch was not meeting certain goals. Both her matrix and decathlon scores fell below their respective goals. Plaintiff agrees that her branch was not meeting its goals at that time. Pl. Dep. 89. She does not dispute any of Robinson's comments on her 2009 PDP. Pl. Dep. 91-95, 99. Plaintiff's 2010 rating fell two levels to Needs Immediate Improvement, the lowest rating

available. Although she improved her matrix score, she continued to exhibit deficiencies in loan production, net new transaction accounts, and decathlon performance. Again, Plaintiff does not dispute any of Robinson's comments in her 2010 PDP. Pl. Dep. 123-124.

It is also undisputed that even after Robinson placed Plaintiff on a 90-day Performance Improvement Plan (PIP) in January of 2011, she still failed to improve her performance. In the PIP, Robinson outlined areas of concern, the goals Plaintiff needed to reach, and examples of things she could do to improve in those areas. The PIP also warned Plaintiff that "if you do not successfully complete this performance improvement plan within the time frames and expectations given, and if you do not sustain an acceptable level of performance, further disciplinary action will result, which may include termination of your employment." Pl. Dep. Ex. 15. However, on April 5, 2011, Robinson gave Plaintiff a written warning, in which she noted that Plaintiff had not sustained an adequate level of performance as set forth in the 90-day PIP. Pl. Dep. Ex. 17. She further noted that Plaintiff was below her production goals in all areas except for two. Id. The written warning specifically set forth the goals that were provided in the 90-day PIP and Plaintiff's results. Id. Robinson also noted that Plaintiff had failed to proactively schedule joint calls with her for coaching. Id. Again, the written warning informed Plaintiff that failure to meet the expectations listed in the written warning would result in further disciplinary action, up to and including termination. Id. On June 30, 2011, Plaintiff received a final written warning for her failure to improve her performance. Pl. Dep. Ex. 20. Again, Robinson outlined the specific goals for Plaintiff and Plaintiff's failure to meet those goals. Id. The final written warning provided that termination would result if Plaintiff failed to meet expectations. Id. Plaintiff does not dispute any of the information set forth in the final written warning. Pl. Dep. 134.

Plaintiff asserts, without citation to the record, that "at the time of termination the Plaintiff's

numbers had improved that the Plaintiff was meeting all categories except for small business and retail loan goals." Pl. Response 21. However, the evidence in the record does not support this bald assertion. As set forth above, the matrix for Plaintiff's branch as of July 31, 2011 was 54.57, a figure even lower than her matrix performance in 2010. Pl. Dep. Ex. 21. Plaintiff had low performance with respect to loan production, customer service, past-due loans, and net income growth, scoring no points on the matrix with respect to these goals. Id. Moreover, Plaintiff did not meet the minimum amount for retail loans during the twelve-month period beginning August 2010; in fact, Plaintiff never met the lower goal for loan production set by Robinson in her PIP. Pl. Dep. 144-145.

Plaintiff argues that Defendant fails to take into consideration Plaintiff's work environment during the "month that Robinson states that Plaintiff failed to improve." Pl. Response 21. Plaintiff notes that her bank was robbed in June of 2011 and that she had an employee embezzling money. However, the PIP was put into place in January of 2011 and Plaintiff was given several chances over approximately six months to improve her performance and reach the goals established for her in her position as FCL IV. That Plaintiff just had a bad month is not a reasonable inference based upon the evidence presented.

Plaintiff also argues that her lack of improvement stemmed from Robinson's failure to properly train her. However, as set forth above, the PIP and the written warnings provided Plaintiff with specific actions she should take to improve her performance. Furthermore, Robinson specifically states in the April 2011 written warning that Plaintiff had failed to proactively schedule conference calls with her.

For these reasons, Plaintiff fails to present sufficient evidence to create an issue of fact as to whether her job performance was satisfactory at the time of her termination. Thus, she fails to

establish a prima facie case of discrimination.

Additionally, Defendant argues that Plaintiff fails to show that similarly situated individuals outside her protected class received more favorable treatment. To be similarly situated, a "plaintiff must establish that 'other employees' were similarly situated in all relevant respects; that they 'dealt with the same supervisor, [were] subject to the same standards and ... engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.' " See Ward v. City of North Myrtle Beach, 457 F.Supp.2d 625, 643 (D.S.C.2006). "The similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful." Lightner v. City of Wilmington, 545 F.3d 260, 265 (4th Cir.2008).

In her deposition, Plaintiff identifies Denise Brown, Justin Gooding, Ann Adams, Misty Walker, Joseph Jones, and Lisa Spencer as younger employees who were treated differently than she was with respect to their performance at BB&T. Pl. Dep. 157-158. Each of these individuals reported to Robinson. In her Response, Plaintiff fails to address these specific individuals and asserts only that "3 FCLs were performing less than the Plaintiff's 55.07 percent." Pl. Response 25. In support she cites only to the unsworn statement she submitted to the EEOC. Pl. Statement.

At the time of Plaintiff's termination, Brown was 41 years old and an FCL IV; Gooding was 25 years old and an FCL I; Adams was 34 years old and an FCL I; Walker was 35 years old and an FCL II; Jones was 26 years old and an FCL I; and, Spencer was 27 years old and an FCL I. Robinson Decl. at ¶ 9. Brown, the only comparator at the same FCL level as Plaintiff, falls within Plaintiff's protected class and, thus, is not a proper comparator. Plaintiff argues that the FCL level of these individuals is irrelevant to whether they are similarly situated. However, as set forth above and by Plaintiff's own admission, individuals at different FCL levels are subject to meeting

different thresholds. Pl. Dep. 55; Robinson Dep. 85. Thus, they, too, are not proper comparators.

Nevertheless, even if the individuals Plaintiff named in her deposition were subject to the same standards, Plaintiff admits that she has no information regarding their PDP ratings; whether they had PIPs or other warnings; how they dealt with performance problems at their branches; how they held their employees accountable; whether their employees were on PIPs or warnings; the performance of their branches before or after Plaintiff's termination; their matrix results; their decathlon results; their leadership qualities with their employees; their investment referral performance; the growth of their branches; their non-interest income results; and whether they were on the conference calls for specific performance issues as Plaintiff was. Pl. Dep. 158-181. Without specific evidence regarding the performance of these other employees, Plaintiff cannot show that they were similarly situated. Thus, for this reason, too, Plaintiff fails to establish a prima facie case of age discrimination, and summary judgment is appropriate.

### B.      Hostile Work Environment in violation of the ADEA

Plaintiff also alleges that she was subjected to a hostile work environment because of her age because Robinson asked her on two occasions if she planned to retire. To state a prima facie case of a hostile work environment, a plaintiff must demonstrate that: (1) she experienced unwelcome harassment; (2) the harassment was based on her protected class; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer." Chao v. Rivendell Woods, Inc., 415 F.3d 342, 347 (4th Cir.2005); White v. BFI Waste Servs., LLC, 375 F.3d 288, 297 (4th Cir.2004); Bass v. E.I. DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir.2003).

Defendant argues that the conduct alleged by Plaintiff to be harassment is not sufficiently severe or pervasive to create a hostile work environment.

Plaintiff must present evidence sufficient to establish that the environment was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (citing <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Actionable harassment occurs when the workplace is "permeated with discriminatory intimidation, ridicule, and insult." <u>Harris</u>, 510 U.S. at 21. Title VII is not a "general civility code." <u>Oncale v. Sundowner Offshore Services, Inc.</u>, 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). "Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe and pervasive standard." <u>EEOC v. Sunbelt Rentals, Inc.</u>, 521 F.3d 306, 315 (4th Cir.2008). Plaintiff also fails to make this showing. No reasonable juror could conclude that Robinson's two questions about Plaintiff's retirement plans that it permeated her workplace with intimidation, ridicule and insult. Thus, Plaintiff's hostile work environment claim fails as well.

## V.     CONCLUSION

For the reasons discussed above, it is recommended that Defendant's Motion for Summary Judgment (Document # 28) be granted and this case be dismissed in its entirety.

 s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

December 11, 2013
Florence, South Carolina